LAW OFFICES OF REGINA SPURLEY
Regina Spurley (SBN 256908)
144 N. GLENDALE AVE., SUITE 300
GLENDALE, CALIFORNIA 91206
TELEPHONE:  (310) 285-8595
TELEFAX:     (310) 300-2112
regina@raafirm.com

Attorneys for Plaintiff,
CHIEN TRAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHIEN TRAN, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>SAFECO INSURANCE COMPANY OF AMERICA, a California corporation; and ERICA PURDY, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. 8:24−cv−00765−JVS−JDE<br>Assigned to the Hon. James V. Selna<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:          February 10, 2025<br>Time:          1:30 P.m.<br>Courtroom:   10C |

## TO THE HON. COURT, ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Plaintiff Chien Tran ("Plaintiff" or "Tran") hereby opposes as follows the Motion for Summary Judgment or in the alternative Partial Summary Judgment ("MSJ") by Defendant Safeco Insurance Company of America ("Defendant"). This opposition is based on the fact that the MSJ is unsupported by facts that either eliminate an essential element of any cause of action or establish an affirmative defense.

## <u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION .................................................................................... 6

II.     FACTS    7

III.    ARGUMENT ........................................................................................ 15

   A.   The One-Year Statute of Limitations is Tolled During all Periods of Time When Defendant Has the Claim Open ..................................................... 17

   B.   The One-Year Statute of Limitations Was Tolled by the Insurance Commissioner as a Result of a Covid Moratorium ........................................ 18

   C.   Merely Hiring Experts Does Not Establish the Genuine Dispute Doctrine; Courts Must Still Evaluate Whether the Investigation Was Unreasonable ............... 19

         i.    The water loss was covered under the express terms of the policy ............................................................................. 19

         ii.   The genuine dispute doctrine is not absolute and does not automatically absolve an insurer of liability; especially where the expert opinions are unreasonable and the investigation is unreasonable ............................................... 24

   D.   Punitive Damages Is A Jury Question As It Requires Factual Analysis To Determine If Defendant's Acts Were Malicious, Oppressive, or Fraudulent .......... 28

IV.    CONCLUSION .................................................................................... 29

## **TABLE OF AUTHORITIES**

**Cases**

*Aerojet Gen. Corp. v. Superior Court*, 177 Cal. App. 3d 950, 953 (1986) ...............15

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986) ......................................14

*Ashou v. Liberty Mut. Fire Ins. Co.*, 138 Cal. App. 4th 748, 762 (2006) ................17

*Bornstein v. J.C. Penney Life Ins. Co.*, 946 F.Supp. 814, 821 (C.D.Cal.1996) ........15

*Bosetti v. U.S. Life Ins. Co.* (2009) 175 Cal.App.4th 1208 ......................................26

*Bravo v. U.S. Life Ins. Co. in City of N.Y.*, 701 F. Supp. 2d 1145, 1160 (E.D. Cal. 2010) ..........................................................................................................................15

*Ceausu v. Progressive Cas. Ins. Co.*, 2013 WL 12131280 (C.D. Cal. Oct. 10, 2013) ..............................................................................................................................28

*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal. App. 4th 339 .................................................................................................24

*Dairy America, Inc. v. New York Marine and General Ins. Co.*, 2010 WL 2102716, 6 (E.D. Cal. 2010) ................................................................................................28

*Egan v. Mutual of Omaha Insurance Company*, 24 Cal.3d 809, 817-819 (1979) ....24

*Erie R. Co. v. Tompkins*, 304 U. S. 64 (1938) ...........................................................15

*Fadeeff v. State Farm Gen. Ins. Co.* (2020) 50 Cal.App.5th 94 ...............................25

*Forman v. Chicago Title Ins. Co.*, 32 Cal. App 4th 998, 1002-1003 (1995 .............16

*Foster v. Liberty Mut. Fire Ins. Co.*, 333 F. Supp. 3d 996, 1000 (E.D. Cal. 2018) ..17

*Garvey v. State Farm Fire & Cas. Co.* (1989) 48 Cal.3d 395 .....................................6

*Guebara v. Allstate Ins. Co.* (9th Cir. 2001) 237 F.3d 987 ......................................23

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F. 3d 998, 1009-10 (9th Cir. 2004) ................................................................................................................24

*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062 ........................................23

*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747...............................6

*Kim v. Mapfre Insurance Company*, 2020 WL 2790011, at *3 (C.D.Cal., 2020) ....22

*Lantzy v. Centex Homes*, 31 Cal. 4th 363, 370-71 (2003).......................................16

*Marcario v. City of Orange*, 155 Cal. App. 4th 397, 408-409 (2007) ...................... 18

*Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996) ......... 24

*Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d. 409, 412 (5th Cir. 2003) .................. 16

*McCoy v. Progressive West Ins. Co.* (2009) 171 Cal.App.4th 785 ........................... 26

*Montrose Chemical Corp. v. Superior Court* (Canadian Universal Ins. Co., Inc.) 6 Cal. 4th 291. 299-300  (1993) ................................................................................. 25

*Murray v. State Farm Fire & Cal. Co.* (1990) 219 Cal.App.3d 58 .......................... 21

*Nasiri v. Allstate Indem. Co.*, 41 F. App'x 76, 79 (9th Cir. 2002) ........................... 29

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir.1999) ............................................................................................................... 14

*Neal v. Farmers Ins. Exch.* (1978) 21 Cal.3d 910 .................................................. 28

*Prudential-LMI Commercial Ins. V. Sup. Ct.*, 51 Cal.3d 677, 678 (1990) .............. 16

*Regents of U.C. v. Super. Ct. of L.A. County*, 413 P.3d 656, 663 (Cal. 2018) .......... 15

*Sevilla v. Stearns-Roger, Inc.* (1980) 101 Cal.App.3d 608, 611 .............................. 16

*Singh v. Allstate Ins. Co.*, 63 Cal. App. 4th 135, 140 (1998) ................................... 17

*Sully-Jones Contractors, Inc. v. American Safety*, 2010 WL 1839114, 5 (S.D.Cal. 2010) ..................................................................................................................... 25

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987) ..................................................................................................................... 15

*Transp. Ins. Co. v. TIG Ins. Co.*, 202 Cal. App. 4th 984, 996 (2012) ...................... 17

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 597 (1970).... 18

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ........................................ 15

*Ward v. Allstate Ins. Co.*, 964 F.Supp. 307, 312-13 (C.D.Cal.1997) ........................ 15

*Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 724 (2007).................................. 15

*Wyatt v. Terhune*, 315 F.3d 1108, 1117-18 (9th Cir. 2003) ..................................... 15

**Statutes**

10 Cal. Code Regs § 2695.1 ...................................................................................... 23

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

Fed. R. Civ. P. 56......................................................................................14

Ins. Code § 790.03 ...................................................................................23

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is an insurance bad faith case. Defendant sold an all-risk insurance policy to Tran to cover Tran's apartment building. An all-risk policy provides the broadest form of coverage, granting coverage for all risks unless expressly excluded. Tran's property experienced weather related damage to the roof during an atmospheric river event in March 2021. In turn, the roof damage allowed water to intrude into individual apartments, causing further damage and resulting in the tenants of those units to moving out. Defendant wrongfully misinterpreted its own policy, which contains the "ensuing loss" provision. Defendant denied coverage, arguing that the water intrusion was due to wear and tear to the roof. However, the ensuing loss provision, which the Defendant totally ignored, provides coverage for wear and tear, among other causes, for the resultant damages from a weather event. In other words, while the policy does not cover repairs to the roof itself, it does cover repairs to the units that were damaged as a result of the roof leaking.

Defendant moves for summary judgment on two bases. One, the statute of limitations. However, because Defendants carries the burden of proof on this affirmative defense, Defendant must prove every element with undisputed facts. Defendant has failed to carry its burden because it stops the chronology and analysis at the date of the denial, completely ignoring the fact that after the denial, Defendant re-opened the claim, which tolled the statute of limitations. Two, Defendant invokes the genuine dispute doctrine, arguing that the mere act of hiring an engineer to rely on for the denial automatically shields Defendant from bad faith. However, Defendant's actions must still be reasonable. Defendant further ignores that Tran hired an engineer, which dispute the conclusions of Defendant's engineer, making Defendant's blind reliance and consideration of only its own engineer's report unreasonable. The genuine dispute doctrine does not permit Defendant to hire an expert in order to manufacture a dispute.

## II.    **FACTS**

Tran owns an apartment building at 12292 Ranchero Avenue, Garden Grove, California 92843 ("the "Property"). (DSUF[1] 1.) Tran was insured with Defendant pursuant to a landlord protection insurance policy ("the Policy"). (DSUF 1.) Defendant sold to Tran has an "All Risk Policy". (PUMF 1.) An all-risk policy is the broadest form of coverage available; all risks are covered unless the cause of the loss is expressly excluded. *Garvey v. State Farm Fire & Cas. Co.* (1989) 48 Cal.3d 395, 407; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 751. The Policy covers all perils that result in an accidental direct physical loss to the property, unless specifically excluded. (PUMF 1.)

On March 10, 2021, during an atmospheric river event causing heavy wind and rain, multiple shingles became creased and lifted on the roof of the Property, allowing water intrusion into the interior of the apartment units. (PUMF 2.) Further, the apartment units sustained damage from wind driven rain through sides of the exterior elevation. (PUMF 2.) As a result, Tran hired a public adjuster ("PA") and reported the loss to Defendant on March 11, 2021, through his public adjuster. (DSUF 5, 6.) To protect the Property from further damage, Tran had the roof tarped to stop further roof leaks while the claim was being handled by Defendant. (PUMF 3.)

Defendant opened the claim and assigned Erica Purdy for claims handling. (DSUF 7, 8.) On April 2, 2021, Defendant inspected the Property and noted that Defendant believed there were no weather-related damages to the Property. (DSUF 12-17.) Tran's PA attended the inspection. (DSUF 14.) Immediately thereafter, Defendant assigned this claim to its Special Investigations Unit ("SIU"), which is done when Defendant wants to make the case that a claim is "fraudulent". (PUMF 4.) SIU began running a background check on Tran. (PUMF 4.)

On April 13, 2021, Defendant hired a biased engineering company, Rimkus

---

[1] DSUF refers to Defendant's Separate Statement of Undisputed Facts. PUMF refers to Plaintiff's Additional Undisputed Material Facts.

Consulting Group, Inc. to inspect the Property and determine cause of loss. (DSUF 19; PUMF 5.) Rimkus inspected on April 29, 2021. (PUMF 6.) The PA attended the inspection with Rimkus, during which, Rimkus advised the PA that it will generate a report of its findings within two weeks, and that Rimkus had everything it needs. (PUMF 7.) Rimkus did not provide any reports of its findings. (PUMF 8.) Further, during the inspection, Rimkus staff manipulated the roof tarp, damaging the tarp, causing Tran to have to re-tarp the roof. (PUMF 9.)

On May 7, 2021, Defendant demanded that Rimkus perform a second inspection and blamed Tran for having a tarp on the roof, while also advising Tran that he was required to protect the Property from further damage by tarping the roof. (PUMF 10.) Defendant demanded that for Rimkus's second inspection, Tran was required to remove the tarp and that Defendant would pay for such removal and replacement of the tarp as a claim expense. (PUMF 10.) Clearly, Defendant wanted Rimkus to come up with reasons to help Defendant deny the claim, because the second inspection by Rimkus was a directive from Defendant to Rimkus; Rimkus had not requested to inspect for a second time. (PUMF 11.) Tran re-tarped the roof and asked for the promised the reimbursement. (PUMF 12.) Because Defendant was refusing to reimburse for the second tarping, Tran's PA refused to permit further inspections by Rimkus because it was Rimkus who damaged the tarp in the first place, and Defendant was now refusing to honor its promise to pay for the re-tarping. (PUMF 13.)

On May 18, 2021, the PA wrote an email to Rimkus as follows  (PUMF 14):

05/18/2021 10:28am

Wayne,

We are in the process of coordinating this access. There is unrest amongst the tenants. The insured lost one tenant thus far due to living conditions and delays from the carrier.

The mitigation company has now two outstanding invoices awaiting Liberty Mutual's indemnification while Erica is asking for the tarps to be manipulated a third time without pay. This would not be the case if it was her program vendor.

**During our site inspection, you stated you have acquired the information you need to deliver a report in two weeks and requested photo**

**documentation to be shared with you. Said documentation were shared.**

Now, it appears Erica Purdy is driving and pressing for a third inspection overall, incurring more time loss and business loss for the insured.

In a nutshell, the tenants are fed up and vacating the building one by one and Liberty Mutual through their actions will be held responsible for the long term ramifications. If this does not answer your question, I can elaborate.

Best regards,

Charles Younes

On May 22, 2021, while claiming to the PA that Rimkus was unable to come up with an opinion on the cause of loss to the Property due to the tarp on the roof, internally, Defendant had already decided that it was going to deny the claim for wear and tear, and purportedly improper installation. (PUMF 15.) This decision echoed the same principles that Defendant generated on April 2, 2021, following its initial inspection. (PUMF 16.) This decision was made before hiring Rimkus, any report or opinions from Rimkus and before the second inspection. (PUMF 15-16.) Clearly, Rimkus was hired only to cover Defendant's decision to deny the claim, which Defendant already knew before hiring Rimkus. (PUMF 15-16.)

On May 25, 2021, the PA sent Defendant an email describing the ongoing issues with Defendant's claims handling, also seeking answers to the following questions (PUMF 17):

… Second, in your letter, you stated the following; Inspection damages are inconsistent with cause of loss and damages being claimed.

Who inspected the property and provided you with this assumption?

Did you personally inspect the risk?

Please define inconsistent with the cause of loss and damages. …

Did you request an inspection and access was provided for your independent adjuster from Alacrity conducted on April 1st 2021.

Did you request an inspection and access was provided for your Rimkus engineer, conducted on April 29th 2021.

Did you request mitigation documents which were provided to Krista Labrie and Liberty Mutual, collectively, on April 30th 2021.

Were you not provided documents for the second tarping estimate. currently incurred, on May 10th 2021.

Were you not provided the asbestos-lead survey and invoice on May 7th 2021.

Did you not conduct a recorded statement with the insured on April 15th lead by Ms. Stephanie Winthrop?

On May 26, 2021, Defendant accused the PA of not "cooperating" with the insurer because the PA was demanding that Defendant honor its promise to reimburse

9

for the re-tarping, because Rimkus had caused damage to the tarp during its original inspection. (PUMF 18.) The PA responded that Defendant is not being denied access, and can inspect any time. (PUMF 18.) However, because Defendant had refused to pay for the re-tarping, Tran's own vendor was refusing to re-tarp. (PUMF 18.) In response, Defendant sent a letter to the PA that the claim was now being investigated under a reservation of rights, i.e. in other words, Defendant had already determined that it was not going to cover the claim despite its investigation. (PUMF 19.)

On June 9, 2021, Defendant hired its own vendor, Ladder Now, to remove the roof tarp, and Rimkus inspected the Property a second time. (PUMF 20.) The roof had to be re-tarped a third time. (PUMF 20.)

On June 10, 2021, the PA responded to the reservation of rights, bringing to the Defendant's attention the ongoing claims handling issues as follows (PUMF 21):

6/10/2021 12:32pm

Yellow Claims to Carrier (Erica Purdy):

Ms. Purdy,

Please see below communication in response to your letter dated June 5th attached herein for your reference titled " ROR Wind".

You stated: " Based on the information available, the reasons for our reservation of rights under the Policy or under applicable law include, but are not limited to, the following:

• Our initial inspection did not support any covered damages based upon our visual inspection for the date and/or cause of loss claimed.
Kindly provide a copy of the report supporting the above statement. Simply stating the latter does not suffice as you have an obligation to provide a reasonable explanation supporting your position.

• Delayed communication to field adjuster for inspection scheduling.
As you are aware, the risk is inhabited by 4 tenants who are concerns for their wellbeing. The delays you are referring to are protected by Law. Tenants have rights. Simply barging into their home is not proper nor lawful.

• Mechanical/Manufactured damage observed to roofing system.
Kindly provide the report supporting this assertion. Is this your determination or the objective opinion of a licensed expert / contractor.

• Non-industry standard tarping limiting access to roof during inspections.
This assertion is unfounded, kindly refer to your roofer who conducted the latest detachment and reset of the tarping. You will find out this method is standard to alleviate compromising the roofing shingles. Nevertheless, kindly provide the report supporting your statement on Non-industry standard along with your expert's credentials.

• Unsealed tarp with sandbags utilized which is non-industry standard.

This assertion is unfounded, kindly refer to your roofer who conducted the latest detachment and reset of the tarping. You will find out this method is standard to alleviate compromising the roofing shingles. Nevertheless, kindly provide the report supporting your statement on Non-industry standard along with your expert's credentials.

• Modified bitumen roofing observed to not have any cracking within mastic or rubber roofing.

Kindly provide your report supporting this assertion. Modified bitumen is found installed in two places. Overhang at the patios and roof of the parking garage.

Your assertions are unfounded and we hereby demand a copy of the expert's report supporting since premature assertion.

• Manufacturing product defect causing minor degranulation of shingles.

Kindly provide the licensed expert's report supporting this opinion. Is this your opinion or that of a licensed trade.

• Continuous tile flooring in three units damaged in same location.

We noted damage in two units at the tile floor covering. Kindly highlight the damage originating from the 3 units you are referring to.

• Excessive microbial growth in one unit observed which appears to be potential long term damage.

Kindly provide the expert's opinion supporting long term. Also, kindly define long term in terms of weeks, months or years. Kindly provide the expert's report supporting your opinion unless this is an opinion of your own.

• Excessive mitigation material removal completed.

Kindly define excessive mitigation. Did you not receive the moisture readings supporting the mitigation efforts? Kindly provide your expert's opinion of excessive mitigation and the reasoning supporting this statement.

• Garden Grove mitigation company is approx. fifty miles away.

How is this relevant to this claim? Who is Garden Grove mitigation? Why is the distance of the contractor relevant to any claim? Is 50 miles a threshold or deal breaker to retain a contractor? Is this compliant with California laws and regulations?

• Whole room walls and ceilings were removed for mitigation with some rooms being above the roof-line of the modified bitumen roofing with no flood cuts observed which is typical industry standard water mitigation handling.

Are you asserting your opinion on this matter or is this supported by an expert opinion licensed in their own right?

• All four units affected.

How is this relevant to the claim? Would this change the outcome or your position is only 1 or 2 or 3 units were affected rather than 4.

ROR Reservation of Rights 045028318-01 Page 8 of 9

• Weather on date of loss was not severe enough to have caused roof damage and subsequent alleged water damage. The day before and after also did not have substantial weather.

Kindly refer to the attached weather report. Exhibit named " weather in March 2021 in Garden Grove, California, USA". Wind speed ranged from no wind to upwards of 13 mph, accompanied by thunderstorms and light to heavy rain. Based on this information, what do you categorize severe?

• Non-industry standard reports, billing, etc. received.

You were provided with Pre and Post mitigation photo documentation, you were provided with estimates/invoices for tarping and mitigation and re-tarping.

• No water mitigation drying logs remitted .

We will request the dry logs from the mitigation vendor. Once received, will this change the outcome of this claim? Does this affect your position on the matter?

• Additional information previously requested with reservation of rights letter and not received.

• Any and all signed repair contract(s) between you and/or your client and the repair contractor detailing the agreement made with them. – Received the one with R&R unknown if any others.

None as of yet. Why would the insured sign repair contracts when we are now several months since the DOL without adequate, fair and reasonable resolution and indemnification. Your request negates logic.

• Any estimates or invoices received. • Proof of any payments made for repairs. • Any additional documents you have signed in regards to repairs made to the home related to this claim.

Invoices and estimates in our possession were shared with your office. No additional information received as of yet awaiting progress updates from your office and indemnification.

• Signed and dated proof of loss previously requested.

Soon to be shared with your office. We are currently awaiting the insured to notarize the form.

• Unable to sufficiently inspection roof due to tarping being present during our inspection & engineer's inspection.

You commissioned Rimkus engineering to conduct an inspection of the property. You failed to advise your expert of the tarps' presence. You then forced your expert to go back on site to remove the tarps and conduct further investigation. You attempted to assert your authority on the insured's contractor to return to the scene of the loss and once again, for the third time, detach and reset the tarps while they have two outstanding invoices with you.

Please be advised, the demand for documentation and reports supporting your premature position(s) in this matter are owed and discoverable per California Insurance Code Section 2071.

This demand is inclusive of the invoices, estimates and payments issued to Rimkus engineering and Ladder Now. Failure to provide this information is a direction violation of the above stated California Insurance Code.

Best regards,

Charles Younes

In response, Defendant wrote that these are just "hypothetical conditions" and refused to respond substantively. (PUMF 22.) On June 29, 2021, before receiving any reports from Rimkus, Defendant made a claim notes entry that it was going to deny the claim based on the engineer's findings. (PUMF 23.) On July 6, 2021, Rimkus generated its report, claiming that cause of loss was due to wear and tear of the roof, and improper manufacturing of the shingles, mirroring Defendant's position that Defendant already knew it was going to take as early as Defendant's original inspection on April 2, 2021, before Rimkus was hired. (DSUF 21, PUMF 24.)

On July 20, 2021, Defendant denied the claim on the basis of wear and tear, and improper installation of the roof. (DSUF 25.) This analysis was based on a

1  misinterpretation of Defendant's own Policy, because it completely ignores the

2  ensuing loss provisions of the Policy. (PUMF 1.) At page 6 of the Policy, in a section

3  called "Perils Insured Against", the Policy states that it covers all accidental physical

4  loss to Property, unless excluded in the general exclusions. (PUMF 1.) This section

5  contains the exclusion for wear and tear relied on by Defendant in the denial letter.

6  Importantly, and this is totally absent from the MSJ or any analysis in the denial letter,

7  the exclusions enumerated 2 through 7 in this section, underneath those exclusions,

8  there is important ensuing loss language, which states: "Under items 2. thru 7. any

9  ensuing loss, not excluded or excepted in this policy, is covered." This means that the

10  Policy will not cover the item itself that causes the loss, i.e. the roof, but will cover

11  the damages that result from the item that caused the loss, i.e. water damage to the

12  interior of the apartment units and building (except the roof itself). (PUMF 1.) This

13  includes wear and tear as the cause of the loss. (PUMF 1.) Likewise, at page 10 of the

14  Policy, under General Exclusions, there is language that applies to improper

15  construction, which includes the same ensuing loss language. (PUMF 1.) It states:

16      10. Planning, Construction or Maintenance, meaning faulty, inadequate
    or defective:

17      a. planning, zoning, development, surveying, siting;
    b. design, specifications, workmanship, repair, construction, renovation,

18  remodeling, grading,
    compaction;

19      c. materials used in repair, construction, renovation or remodeling; or
    d. maintenance;

20      of property whether on or off the Described Location by any person or
    organization. **However, any ensuing loss not excluded or excepted by any**

21      **other provision in this policy is covered.** (PUMF 1.)

22  This is the exclusion under which Defendant denied the claim. (DSUF 25.) Again, the

23  exclusion contains an ensuing loss provision, which means that even if the roof was

24  improperly installed, the Policy will not cover damages to the roof itself, but will

25  cover the damages to the interior of the units caused by the leaking of the roof. (PUMF

26  1.) It is clear that Defendant ignored this ensuing loss language and intentionally

27  misinterpreted its own policy. Even if Rimkus's opinion was correct that the water

28  intrusion was a result of wear and tear of the roof, or improper construction of the

1  roof, the ensuing loss provision still affords coverage for the resulting damage to the

2  interior of the building and interior of the apartment units despite wear and tear or

3  improper construction. (PUMF 1.)

4      Defendant's chronology in the MSJ ends at the denial letter, but this was not

5  the end of the claim.

6      After the denial letter, Tran's PA disputed Defendant's findings and the copycat

7  opinion of Rimkus, and hired an engineer, Palos Verdes Engineering, to explain why

8  and how the atmospheric river event caused accidental direct, physical loss to the

9  Property. (PUMF 25.) On November 15, 2021, Palos Verdes Engineering provided a

10  report to the PA. (PUMF 26.) The report included weather reports and analysis from

11  the date of loss, showing that there were 32 mile an hour winds on the date of loss.

12  (PUMF 26.) The report further states that the wind gusts from southeast to west-

13  southwest and south to southwest direction affected the east elevation of the Property.

14  (PUMF 26.) The report also details interviews with the tenants of the building, who

15  confirmed that these damages had not occurred before and each of the tenants

16  observed water damage on March 10, 2021, specifically, which was the date of the

17  atmospheric river. (PUMF 26.) Witness statements from the tenants directly

18  contradicted Rimkus's opinion that water intrusion was a long term issue. (PUMF

19  26.) Finally, the report states that "The recent rainstorm on March 10, 2021 developed

20  wind gusts that directed rainfall into the building envelope causing water intrusion at

21  the east exterior walls at both levels and at all (4) units." (PUMF 26.)

22      According to Palos Verdes Engineering, the loss occurred because creased

23  shingles were lifted and allowed rainwater to penetrate into the interior of the

24  building. (PUMF 26.) Rimkus did not opine on the creased shingles. (DSUF 21.)

25  The main cause of loss is the creasing of the shingles and the damage to the units

26  below those exact shingles, which is nowhere near the drainage system, such as the

27  gutters. (PUMF 26, DSUF 21.) Water intrusion was noted by Palos Verdes

28  Engineering on and around the sheathing close to the ridge of the roof and along the

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

sloped elevation. (PUMF 26.) Based on this finding, draining is irrelevant as the cause of loss because the creased shingles exacerbated the rainwater intrusion. (PUMF 26.) Defendant's claim notes state that the claim was reopened as of May 20, 2022, and not closed thereafter. (PUMF 27-28.) The claim remains open to this day, tolling the statute of limitations. (PUMF 28.)

## III.  **ARGUMENT**

Summary judgment is a drastic remedy and is therefore to be granted cautiously. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986). In order to support a grant of summary judgment, the moving party must show that the material facts cannot be genuinely disputed and that the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56(c). A factual issue is "genuine" when there is sufficient evidence for a reasonable trier of fact to resolve the issue in the nonmovant's favor. *Anderson*, 477 U.S. at 248. A fact is "material" when its resolution might affect the outcome of the suit under the governing law. *Id.*

Because summary judgment is a "drastic device" that cuts off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any genuine issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir.1999). If the movant meets this burden, the nonmoving party must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson* at 256.; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented in opposition to summary judgment must be liberally construed and any doubts concerning the evidence must be resolved in favor of the party opposing the motion. *Regents of U.C. v. Super. Ct. of L.A. County*, 413 P.3d 656, 663 (Cal. 2018).

Under the doctrine of *Erie R. Co. v. Tompkins*, 304 U. S. 64 (1938), federal courts sitting in diversity apply state substantive law and federal procedural law. Under California law, an insurer is not entitled to summary judgment on a bad faith claim based on a genuine dispute over coverage or the value of the insured's claim unless "the summary judgment record demonstrates the absence of triable issues as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." *Wilson v. 21st Century Ins. Co*., 42 Cal. 4th 713, 724 (2007).

On an insurer's motion for summary judgment seeking denial of an insured's bad faith claim, "the district court applying California law views the evidence in the light most favorable to the insured. If there are any genuine issues concerning the reasonableness of the insurer's dealings with the insured, summary judgment for the insurer is improper." See, e.g., *Ward v. Allstate Ins. Co*., 964 F.Supp. 307, 312-13 (C.D.Cal.1997); *Bornstein v. J.C. Penney Life Ins. Co.*, 946 F.Supp. 814, 821 (C.D.Cal.1996). Finally, where there is evidence that an insurer's experts were unreasonable, it is for the jury to decide whether the insurer's investigation of the insured's claim was reasonable and fair." *Bravo v. U.S. Life Ins. Co. in City of N.Y.*, 701 F. Supp. 2d 1145, 1160 (E.D. Cal. 2010).

A claim that a cause of action is barred by the statute of limitations is an affirmative defense. *Aerojet Gen. Corp. v. Superior Court*, 177 Cal. App. 3d 950, 953 (1986); *Wyatt v. Terhune*, 315 F.3d 1108, 1117-18 (9th Cir. 2003). A defendant moving for summary judgment based on an affirmative defense "must establish beyond peradventure all of the essential elements of the . . . defense to warrant judgment in its favor." *Martin v. Alamo Cmty. Coll. Dist*., 353 F.3d. 409, 412 (5th Cir. 2003). The statute of limitations defense is strictly construed to avoid the forfeiture of a plaintiff's rights. As explained in *Sevilla v. Stearns-Roger, Inc*.: "Statutorily imposed limitations on actions are technical defenses which should be strictly construed to avoid the forfeiture of a plaintiff's rights. Such limitations are

obstacles to just claims, and the courts may not indulge in a strained construction to
apply these statutes to facts of a particular case. Any doubts as to whether summary
disposition is proper must be resolved against the moving parties." *Sevilla v.
Stearns-Roger, Inc.* (1980) 101 Cal.App.3d 608, 611.

## A. The One-Year Statute of Limitations is Tolled During all Periods of Time When Defendant Has the Claim Open

In general, contractual limitations periods is to give insureds a specific period
of time to decide whether to sue. The time it takes the insurer to investigate the
claim ought not be charged against the insured's time to bring suit. Tolling the
statute during this period is "the fair resolution of the statutory incongruity."
*Forman v. Chicago Title Ins. Co.*, 32 Cal. App 4th 998, 1002-1003 (1995). A
contractual limitations period is equitably tolled while the claim is being considered
by the insurer. *Prudential-LMI Commercial Ins. V. Sup. Ct.*, 51 Cal.3d 677, 678
(1990). It would be unconscionable to permit the limitations period to run while the
insured is pursuing its rights in the claims process, as required by the policy. *Id.* at
690.

"[T]he effect of equitable tolling is that the limitations period stops running
during the tolling event, and begins to run again only when the tolling event has
concluded. As a consequence, the tolled interval, no matter when it took place, is
tacked onto the end of the limitations period, thus extending the deadline for suit by
the entire length of time during which the tolling event previously occurred."
*Lantzy v. Centex Homes*, 31 Cal. 4th 363, 370-71 (2003).

Such tolling events include the period of time an insurer investigates and
reviews an insured's claim. *Foster v. Liberty Mut. Fire Ins. Co.*, 333 F. Supp. 3d
996, 1000 (E.D. Cal. 2018) ("California's equitable tolling doctrine pauses the
contractual one-year clock while an insurance company reviews a claim and restarts
the clock only after the claim is denied"); *Transp. Ins. Co. v. TIG Ins. Co.*, 202 Cal.
App. 4th 984, 996 (2012) ("Stronghold is fully consonant with Prudential-LMI to

the extent each case teaches that the limitations period does not run during the claims process, and only commences or reactivates when the insurer has formally and unequivocally denied the claim.");  *Singh v. Allstate Ins. Co.*, 63 Cal. App. 4th 135, 140 (1998) ("[h]ere, plaintiffs notified Allstate of the loss on the same day as the fire loss, on April 27, 1994. Allstate denied the claim by letter on November 9, 1994. It is undisputed that the one-year period was equitably tolled during that time");  *Forman v. Chicago Title Ins. Co.*, 32 Cal. App. 4th at 1001-02 (holding that statute of limitations tolled while insurer decided whether or not to honor the insured's claim).

While an insured's request for reconsideration typically does not toll the statute (*Singh v. Allstate Ins. Co.*, 63 Cal. 4th 135, 142 (1998)), an insurer's agreement to reconsider and reopen the matter does. *Ashou v. Liberty Mut. Fire Ins. Co.*, 138 Cal. App. 4th 748, 762 (2006) [insurers reopening and reconsideration of claim equitably tolled the one-year statutory revival period for filling such claims].

Here, while the claim was denied on July 20, 2021, it was reopened for reconsideration in November 2021, when the PA submitted the report of Palos Verdes Engineering, which contradicts the findings of Rimkus, analyzes the atmospheric river event and includes a report by a weather experts, and includes interviews from the apartment tenants indicating that there were no water damages inside the units until March 10, 2021. Once the claim was reopened, the statute of limitation was tolled again. Defendant's claim notes indicate that the claim was reopened in May 20, 2022. That is well before the 1 year expiration from the date of denial, which would be July 20, 2022, especially because the claim was not closed after it was reopened. That means that the statute of limitations is tolled to this day, and was certainly tolling on the day that the Complaint was initially filed on June 20, 2023.

### B. The One-Year Statute of Limitations Was Tolled by the Insurance Commissioner as a Result of a Covid Moratorium

1    Equitable tolling is a fact intensive issue. *Transp. Ins. Co. v. TIG Ins. Co.*, 202
2  Cal. App. 4th 984, 1012 (2012); *Marcario v. City of Orange*, 155 Cal. App. 4th 397,
3  408-409 (2007). The same is true of accrual of a claim, which is also a question of
4  fact. "There are no hard and fast rules for determining what facts or circumstances
5  will compel inquiry by the injured party and render him chargeable with knowledge.
6  . . It is a question for the trier of fact." Id., citing *United States Liab. Ins. Co. v.*
7  *Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 597 (1970).

8    Defendant's closure of the claim on July 20, 2021 to trigger the statute of
9  limitations directly violated the April 3, 2020 moratorium issued by the California
10 Department of Insurance, wherein all licensees, like Defendant, were "hereby
11 notified that they should not attempt to enforce policy or statutory deadlines on
12 policyholders until ninety (90) days after the end of the statewide "state of
13 emergency" or other "state of emergency" that impacts a specific policyholder."
14 (PUMF 29.) This notice was issued because COVID 19 impacted policyholders
15 abilities to perform duties under their polices. (PUMF 29.) This moratorium is
16 similar to the moratorium recently issued by the Department of Insurance halting
17 insurance policy cancellations to areas affected by the Palisades fire and Eaton fire.
18 (PUMF 29.) Therefore, Defendant had no ability to allow the statute of limitations
19 to run until 90 days after the end of the state of emergency as a result of COVID 19.
20 The state of emergency ended on February 28, 2023, and 90 days after is May 29,
21 2023; meaning that the 1 year statute of limitations did not start running until May
22 29, 2023, giving Tran until May 29, 2024, to file suit. (PUMF 30.)

23    **C. Merely Hiring Experts Does Not Establish the Genuine Dispute**
24       **Doctrine; Courts Must Still Evaluate Whether the Investigation Was**
25       **Unreasonable**

26       i.    <u>**The water loss was covered under the express terms of the**</u>
27             <u>**policy**</u>

The genuine dispute doctrine "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim," and "[a] genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Wilson v. 21st Century Ins. Co*., 42 Cal. 4th 713, 723 (2007). "An insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Id*. Here, Defendant acted unreasonably because it misinterpreted its own policy.

Here, the Parties agreed to policy terms covering accidental direct physical loss to property. Plaintiff reported the loss on March 11, 2021. The following description was included in the facts of loss: "wind/storm damage to the roof and interior of all the four units." (PUMF 31.) Defendant's Policy specifically insures losses caused by windstorm, providing in relevant part (PUMF 1):

COVERAGE A — DWELLING AND COVERAGE B — OTHER STRUCTURES

We insure for accidental direct physical loss to the property described in Coverages A and B except:

1. losses excluded under General Exclusions;

2. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing, while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

     a. maintain heat in the building; or

     b. shut off the water supply and drain the system and appliances of water;

A dwelling under construction includes being remodeled, reconstructed, renovated or repaired in
preparation for occupancy as a residence at the time of loss.

3. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a fence, pavement, patio, swimming pool, hot tub or spa, including their filtration and circulation systems, landscape sprinkler system, foundation, retaining wall, bulkhead, pier, wharf or dock;

4. theft of any property which is not actually part of any building or structure covered;

5. theft in or to a dwelling or structure under construction, including materials or supplies for use in the construction, until or unless the dwelling is occupied. A dwelling under construction includes being remodeled, reconstructed, renovated or repaired. This exclusion does not apply if you are occupying the dwelling as your primary residence at the time of the loss;

6. wind, hail, ice, snow or sleet to outdoor radio and television antennas and aerials, including their lead-in wiring, masts or towers, or to lawns, trees, shrubs or plants;

7.      a. wear and tear, marring, scratching, deterioration;

b. inherent defect, mechanical breakdown or any quality in property that causes it to damage or destroy itself;

c. smog, rust or other corrosion, or electrolysis;

d. smoke from agricultural smudging or industrial operations;

e. settling, cracking, shrinking, bulging, or expansion of pavements, patios, bulkheads, foundations, footings, walls, floors, roofs, ceilings, swimming pools, hot tubs, spas or chimneys;

f. birds, vermin, rodents, insects or domestic animals;

g. pressure from or presence of plant roots.

If any of these cause water to escape from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water, unless otherwise excluded, and we cover the cost of tearing out and replacing any part of the dwelling necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

For the purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment; or roof drain, gutter down spout or similar fixtures or equipment.

Importantly, the last section contained in this section states the following: "Under items 2. thru 7. any ensuing loss, not excluded or excepted in this policy, is covered." (PUMF 1). As the water loss was the result of rain entering the Property through openings caused by wind, and not a loss that is not insured, coverage exists for ensuing damages.

Within the "General Exclusions" section of the Policy, the following language is included in Paragraph 12 (PUMF 1):

12. Weather that contributes in any way with a cause or event excluded in this section to produce a loss. However, any ensuing loss not excluded or excepted by any other provision in this policy is covered.

Similarly, the same language is included in Paragraph 10 (PUMF 1):

10. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:

a. planning, zoning, development, surveying, siting;

b. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. materials used in repair, construction, renovation or remodeling; or

d. maintenance; of property whether on or off the Described Location by any person or organization.

However, any ensuing loss not excluded or excepted by any other provision in this policy is covered.

Importantly, the last section contained in Paragraphs 12 and 10 states the following: "However, any ensuing loss not excluded or excepted by any other provision in this policy is covered." As the water loss was the result of rain entering the Property through openings caused by wind as a result of the atmospheric river event, and not a loss that is excluded, coverage exists for ensuing damages.

The court in *Murray v. State Farm Fire & Cal. Co*. (1990) 219 Cal.App.3d 58 addresses this type of language: "the exclusion for "deterioration" means that State Farm is not obligated to compensate the Murrays for their corroded water pipe. If, however, the Murrays suffered consequential loss as a result of the corroded pipe and that consequential or "ensuing" loss is not excluded under another provision of the policy, the loss is covered." *Murray, supra*, 219 Cal. App 3d at 64. Therefore, even if this Court finds that the loss was due to wear, tear, deterioration, which it should not, or improper construction of the roof, Defendant would still be liable for the resulting damages caused by the alleged wear and tear, or improper installation.

The Court in *Kim v. Mapfre Insurance Company*, 2020 WL 2790011, at *3 (C.D.Cal., 2020), explained that insurance adjusters are considered experts in policy interpretation of the insurance policies issued by their employer, insurance

company. Therefore, if an adjuster misinterprets the policy issued by the insurance company they work for, it is quintessential bad faith as such adjusters are tasked with knowing and properly analyzing their own policies. See *id*. Accordingly, Purdy knew the coverage provided by Defendant's Policy, knew about the ensuing loss provisions, and intentionally and willfully denied the claim on the basis of the wear and tear exclusion and improper construction exclusion, ignoring the ensuing loss provision.

Further, the engineer hired by the PA, Palos Verdes Engineering, corroborated that the water loss appeared to be the direct result of high wind and rainwater. According to the report of Palos Verdes Engineering, which took into account expert weather analysis around the date of loss, the wind speeds and direction was high enough and in a direction that would create openings in the roof and building. The report discusses the creased shingles and their ability to allow rainwater to penetrate the interior of the building. The report contains interviews conducted with the tenants of the affected tenants, which indicate that they had not observed any water damage until March 10, 2021. This observation, in light of the occurrence of the atmospheric river around March 10, 2021, indicates that the water loss was the direct result of a severe storm around March 10, 2021, not long-term damage. The Palos Verdes Engineering report concludes that the magnitude of the damage to the Property suggests severe rainwater penetrated the building at the roof level, eventually making its way into the walls and flowing downward. The apparent water staining, rusting, and evidence of mold within the walls and ceilings near the exterior walls is indicative of such penetration and ensuing damage.

Contrary to the MSJ's assertions, the drainage system that Rimkus blamed for the cause of loss is not located anywhere near the creased shingles or the points of entry of water into the apartment units. Rather, the vast majority of damage was on or around exterior walls, a condition that is consistent with roof penetration after a major storm.

ii. **The genuine dispute doctrine is not absolute and does not automatically absolve an insurer of liability; especially where the expert opinions are unreasonable and the investigation is unreasonable**

Pursuant to *Jordan v. Allstate*, the genuine dispute doctrine is not absolute, and requires an analysis of the following factors: (1) whether the carrier conducted a complete, unbiased investigation; (2) whether the carrier met its duty to investigate even after the policyholder files suit (148 Cal.App.4th at 1076, n. 7); and (3) whether the carrier failed to comply with the provisions of the Unfair Insurance Practices Act (Ins. Code § 790.03) and the regulations promulgated under it (10 Cal. Code Regs § 2695.1, et seq.) *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1076-1078. There will always be a temptation for the carrier to attempt to "game" the process to appear unbiased, but to predictably produce the outcome the carrier wants. There are simply too many ways for the carrier to manipulate the process.

The genuine-dispute doctrine will not apply in the following circumstances: (1) where the insurer was guilty of misrepresenting the nature of investigatory proceedings, (2) if the insurer's employees lie during the depositions, or to the insured, (3) if the insurer selected its experts dishonestly, (4) if the experts were unreasonable, or (5) if the insurer failed to conduct a thorough investigation. *Guebara v. Allstate Ins. Co.* (9th Cir. 2001) 237 F.3d 987; *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal. App. 4th 339, 348-349.

Under long-standing California law, an insured may establish a "bad faith" claim by showing that the insurer's delay or withholding of benefits was unreasonable (i.e., without any reasonable basis for the insurer's position) or without proper cause. *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1072-1073 (2007). A trier of fact may find an insurer acted unreasonably "if the insurer ignores

evidence available to it which supports the claim; the insurer may not just focus on those facts which justify denial of the claim.…" *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996).

"Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg. Inc*., 78 Cal. App. 4th 847, 879 (2000), as modified on denial of reh'g (Mar. 29, 2000). A Court may find that an unreasonable failure to investigate amounting to bad faith "may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." *Id*. at 880; See also *Egan v. Mutual of Omaha Insurance Company*, 24 Cal.3d 809, 817-819 (1979) (concluding that "an insurer may breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim."). In other words, an insurer has a duty to "fully inquire into possible bases that might support the insured's claim." *Id*. at 819 (emphasis added).

"The 'key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable,' " and " '[the] reasonableness of an insurer's claim-handling conduct is ordinarily a question of fact.' " *Id*.; citing, *Hangarter v. Provident Life & Accident Ins. Co*., 373 F. 3d 998, 1009-10 (9th Cir. 2004). The court's finding that triable issues exist regarding whether coverage applies under the subject policy will preclude summary judgment on the issue of the insurer's bad faith. See *Sully-Jones Contractors, Inc. v. American Safety*, 2010 WL 1839114, 5 (S.D.Cal. 2010). "Likewise, the Court cannot determine whether, as a matter of law, [the insurer] is protected by the genuine dispute doctrine." *Id*., citing, *Harbison*, 636 F. Supp. 2d at 1040-41.

The genuine dispute rule in the context of bad faith claims allows a trial court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable. *Harbison*, 636 F. Supp. 2d at 1040; citing, *Wilson v. 21st Century Ins*., 42 Cal. 4th 713, 724 (2007). This Court further

summarized the rule in the context of summary judgment motions as follows: " 'an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues ... as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith.' " *Id.*, citing *Wilson*, 42 Cal. 4th at 724.

In *Harbison*, 636 F. Supp. 2d at 1040, this Court was not convinced the genuine dispute doctrine "should ever properly apply where there is dispute as to coverage, legal or factual." "This is because where there is the potential for coverage, an insurer's duty to defend is triggered." *Id.*; citing, *Montrose Chemical Corp. v. Superior Court* (Canadian Universal Ins. Co., Inc.) 6 Cal. 4th 291. 299-300 (1993). This Court reasoned that "[b]ecause the existence of a genuine dispute as to the insurer's liability indicates that there is at least a potential for coverage, the existence of a genuine dispute is itself enough to trigger the insurer's duty to defend." *Id.* "Accordingly, this court finds that the genuine dispute doctrine appears wholly incompatible with duty to defend cases." *Id.*

An insurer may not insulate itself from liability for bad faith conduct by the simple expedient of hiring an expert for the purpose of manufacturing a genuine dispute. *Fadeeff v. State Farm Gen. Ins. Co.* (2020) 50 Cal.App.5th 94, 103, citing to *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, 90 Cal.App.4th 335, 349, fn. 8 (2001). In other words, when an insurer already knows that it is going to make a certain coverage decision, hiring an expert after the fact to cover that decision is not a genuine dispute, but rather a manufactured dispute. *Chateau Chamberay, supra*, 90 Cal.App.4th at 349, fn. 8. This is because the insurer does not objectively rely on the expert for the opinion, but is merely using the retention of the expert to insulate itself from liability. *McCoy v. Progressive West Ins. Co.*, 171 Cal.App.4th 785, 793 (2009) [Reliance on an expert ... 'will not automatically insulate an insurer from a bad faith claim based on a biased

1  investigation.' ... Although an insurer may rely on experts, summary judgment on a

2  bad faith claim must be denied where the evidence shows 'the insurer dishonestly

3  selected its experts[,] the insurer's experts were unreasonable[,] [or] the insurer

4  failed to conduct a thorough investigation.]) When an insurer is subjectively aware

5  that it has hired a biased expert, it is simply not objectively reasonable to rely on

6  that expert. *Bosetti v. U.S. Life Ins. Co*., 175 Cal.App.4th 1208, 1239  (2009), citing

7  *Chateau Chamberay, supra,* 90 Cal.App.4th at 348-349.

8     Here, Defendant failed to conduct and diligently pursue a thorough, fair, and

9  objective investigation of the claim. Specifically, Defendant misinterpreted its own

10  policy. An analysis of the ensuing loss provisions in the section on wear and tear, as

11  well as the section for weather related damages, and for improper construction,

12  indicates that there was coverage for the damages to the interior of the apartments

13  from the water intrusion that came through the roof and the penetrated the building.

14  While the roof itself is not covered, the resultant damaged caused by the water

15  penetration is. As an expert on its own policy, Defendant's adjuster is imputed with

16  the requisite knowledge on policy interpretation. Accordingly, a misinterpretation is

17  a willful and intentional act. Additionally, Defendant already knew that it was going

18  to deny this claim before hiring Rimkus, and hired Rimkus only to cover itself and

19  manufacture a dispute. In fact, in an email between Erica Purdy and her claims

20  manager Kelli Hughes, wherein Purdy was seeking approval to deny the claim,

21  Purdy's reasoning for the denial was the scope of the damages, not any findings by

22  Rimkus. (PUMF 15.)

23     Further, Defendant failed to fully inquire into the damages to the Property

24  arising from the storm. As of twenty days into the claim, Defendant had already

25  determined that it was poised to deny the claim. After that point, Defendant worked

26  only to collect irrelevant facts to try to support the denial. Defendant instructed

27  Rimkus to generate a report that would support a denial. When that was not possible

28  after Rimkus's first inspection, Defendant instructed Rimkus to inspect again, this is

despite the fact that after the first inspection Rimkus had already advised the PA that it had everything it needed. Thereafter, Rimkus came up with an opinion and findings regarding improper drainage on the roof that had nothing to with the cause of loss. The cause of loss was creased shingles that allowed for rainwater to penetrate the building. Those creased shingles were not located near the drainage system. So even if the drainage system was inadequate, it had nothing to with the creased shingles, which were the cause of loss. Rimkus completely ignored the creased shingles. Additionally, documents submitted by Tran's PA were ignored by Defendant, including the report and findings from Palos Verdes Engineering and the weather reports.

### D. Punitive Damages Is A Jury Question As It Requires Factual Analysis To Determine If Defendant's Acts Were Malicious, Oppressive, or Fraudulent

Pursuant to the Court's scheduling order, discovery does not close in this case until May 27, 2025. [Dkt. 16]. There have been no depositions in this case and granting a motion for summary judgment based on the assertions of Purdy without Plaintiff having the opportunity to depose her would be improper. Spurley Decl. ¶ 2. Regardless, material facts are being contradicted by the parties herein, and courts are not permitted to weigh the credibility of the evidence at the summary judgment stage and must accept the non-moving party's version of the facts. *Dairy America, Inc. v. New York Marine and General Ins. Co*., 2010 WL 2102716, 6 (E.D. Cal. 2010). Lastly, the existence of these material facts as to Plaintiff's claims will also preclude summary judgment on the issue of Defendant's bad faith. See *Harbison v. Am. Motorists Ins. Co*., 636 F. Supp. 2d 1030, 1040-41 (E.D. Cal. 2009).

Whether an insurer committed bad faith and whether that bad faith rises to a level warranting punitive damages are questions for the jury. *Egan, supra,* 24 Cal.3d at 821. On punitive damages, "summary adjudication can be granted only where no reasonable jury could find the evidence 'clear and convincing.' " California law has

1  long held that the same facts supporting a finding of bad faith, may support an

2  award of punitive damages. *Neal v. Farmers Ins. Exch.* (1978) 21 Cal.3d 910. The

3  requisite state of mind, may be proven either expressly by direct evidence probative

4  on the existence of ill-will, or by implication via indirect evidence from which the

5  jury may draw inferences. *Id.*

6      The foregoing facts, thoroughly detailed above, establish Defendant's

7  multiple violations of the Fair Claim Settlement Practices Regulations and the

8  California Insurance Code ¶790.03(h) are so egregious, and the evidence in support

9  of these violations, as enumerated above, is so strong, that at the time of trial, it is

10  likely that Plaintiff will be able to prove by clear and convincing evidence that

11  Defendant has been guilty of oppression, fraud, or malice, entitling the Plaintiffs to

12  punitive damages. Plaintiff have demonstrated facts showing intentional, willful

13  conduct with a conscious disregard for Plaintiff's rights. When presented with the

14  evidence that the main denial bases were inaccurate, Defendant failed to consider

15  this new information, despite its continuing duty to adjust the claim.

16      Should this Court find that genuine issues of material fact exist as to

17  Plaintiff's claim for bad faith, the Court has previously ruled that a majority of

18  courts find that genuine disputes of material fact regarding an insurer's bad faith

19  conduct similarly create a genuine dispute as to an award of punitive damages.

20  *Ceausu v. Progressive Cas. Ins. Co*., 2013 WL 12131280 (C.D. Cal. Oct. 10, 2013).

21  *Nasiri v. Allstate Indem. Co*., 41 F. App'x 76, 79 (9th Cir. 2002).("Because material

22  issues of fact exist as to whether [defendant] acted in bad faith, we cannot say as a

23  matter of law that [defendant] did not act with malice, oppression or fraud."). As a

24  matter of law, should the Court deny the Motion with regard to bad faith, a jury

25  should be left to determine whether the conduct could lead to exemplary damages.

26  **IV.    CONCLUSION**

27      Based on the foregoing, Plaintiff Chien Tran respectfully requests that the

28  Court deny the Motion for Summary Judgment or Partial Summary Judgment.

DATED: January 21, 2025

LAW OFFICES OF REGINA SPURLEY

By: _____
Regina Spurley
Attorneys for Plaintiff CHIEN TRAN

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 144 N. Glendale Ave., Suite 300, Glendale, California 91206.

On January 21, 2025, I served true copies of the following document(s) described as **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT** on the interested parties in this action as follows:

NICHOLAS J. BOOS (SBN 233399)
nboos@maynardnexsen.com
MAYNARD NEXSEN LLP
Two Embarcadero Center, Suite 1450
San Francisco, California 94111
Telephone: (415) 646-4700
Facsimile: (205) 254-1999

Attorneys for Defendant, *Safeco Insurance Company of America*

BY CM/ECF NOTICE OF ELECTRONIC FILING: I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 21, 2025, at Glendale, California.


/s/  Regina Spurley
Regina Spurley